UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------- x

VLADIMIR KRULL,

                Plaintiff,

                v.

ANTHONY J. ANNUCCI, in his
official capacity as Acting
Commissioner of the New York State
Department of Corrections and
Community Supervision, and
MICHELE HARRINGTON, in her
official capacity as Chairperson of the
New York State Board of Examiners of
Sex Offenders,

                Defendants.

----------------------------------------------- x

Docket No. 1:21-cv-03395

**SECOND AMENDED
COMPLAINT**

## INTRODUCTION

1.     This action challenges the unconstitutional policies and practices of the New York State Department of Corrections and Community Supervision ("DOCCS") and the New York State Board of Examiners of Sex Offenders (the "Board") that attempt to compel incarcerated individuals to relinquish their Fifth Amendment right against self-incrimination and penalize individuals who do not give up this right, like Vladimir Krull, with actions that result in lifelong restrictions of liberties and other serious hardships.

2.     Under the supervision of Acting Commissioner Anthony Annucci, DOCCS maintains a policy whereby, in order to complete its Sex Offender

Counseling and Treatment Program (the "Program"), incarcerated participants must admit that they committed the underlying offense for which they were convicted even if they pled not guilty and maintained their innocence. If they refuse and invoke the Fifth Amendment's privilege against self-incrimination, they are expelled from the Program and suffer significant long-term adverse consequences. Incarcerated individuals can ostensibly turn down participation in the Program, but doing so would result in similar adverse consequences as if they were expelled from the Program.

3.      Among other penalties, upon expulsion from or refusal to participate in the Program, the Board automatically assesses significant points to one of the 15 factors relating to an incarcerated individual's Risk Assessment Instrument ("RAI"). In turn, the cumulative tally of RAI points determines that individual's post-incarceration risk level under the Sex Offender Registration Act.

4.      The three varying statutory risk levels dictate what restrictions inmates face following their release from incarceration. The differences between the first and second levels are considerable and amount to substantial deprivations of liberties for formerly incarcerated individuals, including lifetime registration as a sex offender and inclusion in the state's publicly-available online database.

5.      Individuals convicted of sex offenses, especially those who testified to their innocence at trial and are pursuing an appeal or post-conviction relief, face a

Hobson's choice: either incriminate themselves while incarcerated and thereby risk prosecution for perjury and undermine any chance of overturning their conviction, or refuse to self-incriminate and face onerous penalties following their release from incarceration attendant to those with higher risk levels.

6.      Vladimir Krull was forced into precisely this dilemma.  He pled not guilty, testified to his innocence at trial, and is pursuing an appeal of the charges of which he was convicted (he was acquitted of three of the six charges brought against him).  While incarcerated, Mr. Krull, who continues to maintain his innocence, initially enrolled in the Program based on assurances by DOCCS employees that he would not have to admit that he committed the underlying crimes of conviction.  Pursuant to DOCCS' policy and practice, DOCCS employees also threatened Mr. Krull that if he refused to participate in the program, he would be assessed more RAI points and thus receive a higher risk level following his release.

7.      After successfully completing five months of the six-month program, DOCCS staff suddenly demanded that Mr. Krull admit to the behaviors underlying his conviction or be expelled from the Program and endure the immediate consequences of losing good time credits (thus prolonging his period of incarceration), as well as the lifelong repercussions of

being assessed a higher risk level.  DOCCS staff assertedly made these demands in compliance with DOCCS policy and practice.

8.    The penalties confronting Mr. Krull if he refused to state that he committed the underlying offense were so substantial and severe that they constitute unconstitutional compulsion in violation of the Fifth Amendment privilege against self-incrimination.  But Mr. Krull did not give into this compulsion.  He exercised his Fifth Amendment right and, because he did so, was immediately expelled from the Program, which prolonged his period of incarceration by five months.

9.    Acting under the supervision of Chairperson of the Board Michele Harrington, the Board further carried out DOCCS' threats when, consistent with the Board's policy and practice, it added 15 points to Mr. Krull's RAI score. Specifically, as a direct result of Mr. Krull's refusal to self-incriminate and subsequent expulsion from the Program, the Board assessed Mr. Krull the maximum number of points under factor 12 of the RAI ("Factor 12") for failing to demonstrate "acceptance of responsibility."  This punitive action had the effect of designating Mr. Krull a presumptive risk level two registrant instead of risk level one.  Mr. Krull's invocation of the Fifth Amendment and consequent expulsion from the Program were the sole issues that factored into the assessment of points

under Factor 12. The Bronx County Criminal Court adopted the Board's risk level recommendation and designated Mr. Krull as risk level two.

10.     Today, as a risk level two registrant, Mr. Krull faces lasting deprivations of his freedom as a direct consequence of invoking his Fifth Amendment right. His personal information, including his address, his vehicle registration information and a photograph of his face, is displayed in an online registry that is publicly available. He must also comply with onerous reporting and registration requirements for *life.*

11.     In light of the unconstitutional compulsion to incriminate himself that Mr. Krull faced while incarcerated, coupled with the repercussions he suffered and continues to suffer as a direct result of his invocation of his Fifth Amendment rights, an actual, present, and justiciable controversy exists between and among Mr. Krull, on the one hand, and Defendants Annucci and Harrington on the other.

12.     Accordingly, Mr. Krull seeks (i) a declaratory judgment that Defendants' actions violated his Fifth Amendment right against self-incrimination; (ii) a declaratory judgment that DOCCS' policy and practice of requiring inmates to admit guilt for their underlying conviction or be expelled from, or barred from participating in, the Program violates the Fifth Amendment; (iii) a declaratory judgment that the Board's policy and practice

of increasing the RAI score and resulting risk level for inmates who are

expelled from, or decline to participate in, the Program based on the exercise

of their constitutional right against self-incrimination violates the Fifth

Amendment; and (iv) injunctive relief ordering the Board to conduct a

reevaluation of Mr. Krull's RAI without penalizing him for invoking his Fifth

Amendment right against self-incrimination.

## PARTIES, JURISDICTION, AND VENUE

13.    Plaintiff Vladimir Krull is a resident of Yonkers, New York.  He

was incarcerated at Clinton Correctional Facility in Dannemora, New York

("Clinton") from on or about April 6, 2017 to on or about January 26, 2020.

14.    Defendant Anthony J. Annucci is the current Acting

Commissioner of the New York State Department of Corrections and

Community Supervision and held the same position during the period of Mr.

Krull's incarceration.  Mr. Annucci is responsible for the enforcement of all of

DOCCS' rules, regulations, and policies, including the unconstitutional and

official Program policy that violated Mr. Krull's Fifth Amendment rights, and

has the authority to remedy those policies and procedures.  He is sued in his

official capacity.

15.    Defendant Michele Harrington is the current Chairperson of the

New York State Board of Examiners of Sex Offenders and held the same

position during the period of Mr. Krull's incarceration.  The Board consists of

five members and is authorized under N.Y. Correct. Law § 168-L to make

recommendations to the sentencing court regarding the post-incarceration risk

level of people convicted of sex offenses.  Ms. Harrington is responsible for

the unconstitutional policies and procedures of the Board and has the authority

to change them.  She is sued in her official capacity.

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §

1331 and 42 U.S.C. § 1983.  Mr. Krull brings this civil action to redress the harm

he suffered after Defendants, acting under color of New York state law, deprived

him of his rights under the Fifth and Fourteenth Amendments to the United States

Constitution.

17.     Venue is proper in this Court because, after this action was initially

and properly filed in the U.S. District Court for the Northern District of New York,

that Court granted Mr. Krull's consent motion to transfer venue to the Southern

District of New York pursuant to 28 U.S.C. § 1404(a).  *See* Order dated Apr. 12,

2021, ECF No. 44 (granting motion to transfer venue and finding that "Plaintiff has

provided clear and convincing evidence that the convenience of the parties,

witnesses, and other participants in the case would be better served by addressing

this case in the Southern District of New York").

## **FACTS**

DOCCS' Sex Offender Counseling and Treatment Program

18.     Pursuant to New York's Sex Offender Management and Treatment Act, DOCCS operates the Sex Offender Counseling and Treatment Program for incarcerated individuals who have been convicted of sex offenses or have a history of committing sexual offenses.

19.     In order to participate in the Program, participants must sign a form partially waiving confidentiality of their treatment records.  As stated in the Program's Guidelines (the "Guidelines"), the treatment records are subject to disclosure to the Board and other governmental agencies.  In addition, Program treatment records are often sought by prosecutors in connection with Sex Offender Registration Act risk assessment hearings, which determine what risk level and reporting requirements individuals convicted of sex offenses will be assigned upon their release from incarceration.  Prosecutors only need to provide written requests to DOCCS to obtain those records.

20.     The Guidelines have a section that purports to address Program participants' "legal concerns," including those based on their Fifth Amendment right to be free from compelled self-incrimination.  The Guidelines also purport to provide assurances that "an inmate is not required to admit the commission of a particular crime, whether it resulted in the present commitment or not."

Participants need only "discuss his or her behavior in general terms without providing the full names of victims, without disclosing the exact dates, times, and places (e.g., the city, town, etc.) of various sexual offending behavior, and without admitting to any specific crime or the violation of any specific section of the Penal Law."

21.    However, in order to successfully complete the program, the Guidelines state that "the inmate *must* openly and honestly discuss *the behavior that resulted in his or her incarceration* and/or referral to the program" and "demonstrate *acceptance of responsibility for the conduct that resulted in his or her criminal conviction*."  (Emphasis added.)  Participants are also expected to discuss "prior incidents of sexual offending behavior, and the individual thoughts and feelings associated with that behavior, regardless of whether any criminal justice intervention occurred."

22.    Accordingly, DOCCS clearly requires, as a mandatory condition to participate in the Program, that the incarcerated individual assert that they in fact committed the conduct that they were convicted of and accept responsibility for that conduct.  To the extent the Guidelines purport to assure participants that they need not admit "the commission of a particular crime," such assurance is illusory—when a person admits responsibility for the "conduct" or "behavior" that

resulted in their conviction and incarceration they necessarily are admitting the commission of a particular crime, namely, the crime they were convicted of.

23.    The Guidelines explicitly provide that incarcerated individuals will be penalized for invoking their Fifth Amendment rights:  If "[a]n inmate [is] unwilling to participate in the Program based upon a claim that participation violates the inmate's Fifth Amendment rights [then this] will be construed as a refusal [to participate in the Program]."  DOCCS staff must inform individuals of the adverse "consequences" that follow from the invocation of their Fifth Amendment rights (including, *inter alia*, loss of good time credit), and "take great care in explaining that [the refusal] … may be viewed unfavorably by the [Board]," *i.e.*, that it will lead to an increased RAI score and risk level assessment.

<u>Mr. Krull's Background and Underlying Conviction</u>

24.    Vladimir Krull has a long history of serving his country and his community.  He served in the United States Marine Corps from 1999-2004, which included a year-long combat tour in Iraq.  Mr. Krull received a number of awards for his bravery and courage during the course of his service, including the Marine Good Conduct Medal and the Combat Action Ribbon.  He was also awarded the Navy Achievement Medal for organizing his fellow troops in a counter-offensive in response to an insurgent attack.

25.     After being honorably discharged, Mr. Krull joined the New York City Police Department ("NYPD"), where he served for 13 years and rose to the level of Sergeant.  In 2009, he was named "Cop of the Year" in his precinct, and in 2014 the NYPD gave him a public commendation for stopping a robbery in progress on Madison Avenue in Manhattan.  While working as a police officer, Mr. Krull also took night classes at John Jay College, where he received a bachelor of arts degree, *magna cum laude*, in criminology.

26.     In February 2015, Mr. Krull was arrested and charged with engaging in a sexual relationship with the 13-year-old daughter of the woman he had been dating.  The prosecution brought six charges relating to the charged conduct.

27.     Mr. Krull took the stand at his trial in the Bronx County Criminal Court and testified under oath that he was innocent.  Specifically, he denied committing any of the acts that he was alleged to have committed with the complainant.  On January 30, 2017, Mr. Krull was acquitted of three of the six charges.  He was convicted of the remaining three charges and sentenced to three years' imprisonment at Clinton.

28.     Mr. Krull filed a notice of appeal from his conviction and has also filed a motion under New York Criminal Procedure Law § 440 to vacate his conviction on the grounds of ineffective assistance of counsel.  If either Mr. Krull's direct appeal or his motion for post-conviction relief under CPL § 440 is

successful, he could be granted a new trial in which any incriminating statements he made could be used against him.

Mr. Krull Is Pressured to Enroll in the Program

29.    Mr. Krull began serving his sentence at Clinton on or about April 6, 2017 and was a model inmate throughout the term of his incarceration.  On or about June 27, 2017, Mr. Krull met with his Offender Rehabilitation Coordinator, Ms. Banker, to discuss his participation in the Program.

30.    Mr. Krull was reluctant to participate because he believed that participants were required to admit guilt for the crime of their conviction to successfully complete the program.  Mr. Krull told Ms. Banker that he would not admit guilt because he (i) pled not guilty in his criminal case, (ii) testified as to his innocence at trial, and (iii) continued to maintain his innocence.

31.    Ms. Banker reassured Mr. Krull that the law concerning the Program and admissions of guilt changed a few years ago and that inmates were no longer required to admit guilt in order to successfully participate in the Program.

32.    Additionally, Ms. Banker informed Mr. Krull he would be subject to various penalties should he decline to participate, including (i) a disciplinary ticket that would be annotated on his record, (ii) placement on "keeplock" status (confinement to a small cell for 23 hours a day for up to 30 days), (iii) loss of all of

his good time credits, and (iv) an automatic assessment of 15 points on Factor 12 of Mr. Krull's RAI.

33.    Mr. Krull, relying on Ms. Banker's representation that admissions of guilt were no longer part of the Program, and feeling that he had no real choice in the matter but to participate in the Program considering the threatened consequences for non-participation, enrolled in the waiting list for the Program.

Mr. Krull Is Again Assured That He Would Not Have to Admit Guilt

34.    On or about December 22, 2017, before Mr. Krull began the Program, he met with Ms. Breen, the social worker who facilitated the Program in Clinton, for an interview.  Ms. Breen asked Mr. Krull if he still agreed to participate in the program.  Mr. Krull, who continued to feel forced to participate because of the threatened consequences for non-participation, explained to Ms. Breen that he would participate so long as he was not required to admit guilt for the crimes of his conviction.  He reiterated the reasons as to why he could not do so, both from the standpoint of his conscience (he maintains his innocence) and from the adverse legal consequences.

35.    Ms. Breen, like Ms. Banker, told Mr. Krull that he would not be required to admit guilt in order to successfully complete the Program.  She reassured Mr. Krull that active participation and completion of all of the assignments would be sufficient to graduate from the Program.  Mr. Krull took Ms.

Breen at her word and signed the necessary paperwork to participate in the Program.

Mr. Krull Excels in the Program

36.    Mr. Krull began participating in the Program on January 29, 2018. Because he was considered "low risk," he was enrolled in the shortest version of the Program, which met three times per week for six months.

37.    For the next five months, Mr. Krull actively participated in group discussions, completed all written assignments, and received excellent (near-perfect) written evaluations for his performance.

38.    During the Program, Mr. Krull was evaluated twice on March 9, 2018 and May 2, 2018.  His evaluators were Mses. Breen and Rebecca Oey, the latter of whom was a Senior Offender Rehabilitation Coordinator who worked at Clinton during the relevant time period.  At both evaluations, Mses. Breen and Oey told Mr. Krull that he was doing well and making progress in the program.  During those discussions, Mr. Krull openly discussed the circumstances surrounding his arrest and conviction, but did not admit to engaging in criminal conduct and maintained his innocence.

Mr. Krull Is Subject to Unlawful Compulsion to Incriminate Himself

39.    On or about June 18, 2018, with one month remaining in the Program, Mr. Krull was called to meet with Mses. Oey, Breen, and Dana Pierce (another

Offender Rehabilitation Coordinator from DOCCS).  Ms. Oey said in substance, "Today's the day when the rubber meets the road."  She then demanded that Mr. Krull admit guilt for his crimes of conviction or else be expelled from the Program and face similar consequences[1] as if he had not participated in the Program at all— *i.e.*, lose all of his good time credits and automatically be assigned points under Factor 12 of his RAI, which would almost certainly result in a higher risk level assessment upon his release from custody.  Those threatened penalties implicated not just the conditions and length of Mr. Krull's confinement but the length of his post-release restrictions, which would substantially affect his liberty.

40.    Mr. Krull again explained that he would not admit guilt to his crimes of conviction because he pled not guilty at his trial, testified to his innocence, and maintains his innocence to this day, including for the purposes of his direct appeal. Mr. Krull thus invoked his constitutional right not to answer questions that might incriminate him in future proceedings.  Mr. Krull also reminded Ms. Oey that the Guidelines state that inmates are not required to admit guilt to any crimes as part of the program.

---

[1] The only difference in the penalties imposed on incarcerated individuals who are expelled from the Program as compared to those who refuse participation outright is that the latter also receive a disciplinary ticket and are relegated to "keeplock" status.

41.    Ms. Oey rebuffed Mr. Krull, saying in substance, "You are wrong. You have to accept responsibility for your crimes."  Mr. Krull again refused to incriminate himself and Ms. Oey responded that she would expel him from the Program and deny him good time credits.  She also explained that he would be automatically assessed 15 points under Factor 12 on his RAI.  As a result of invoking his Fifth Amendment right to be free from self-incrimination, Mr. Krull was expelled from the Program.[2]

Mr. Krull Is Assessed a Higher RAI Score

42.    On October 25, 2019, the Board, which assesses inmates' RAI scores and makes recommendations to the sentencing court[3] for final adjudication of an inmate's risk level, assessed Mr. Krull's RAI score.

43.    Specifically, under RAI, the Board assigns points to individuals convicted of sex offenses based on 15 factors:

---

[2] In an earlier appeal in this case from the dismissal of Mr. Krull's First Amended Complaint (which was filed *pro se*), the U.S. Court of Appeals for the Second Circuit held that whether the revocation of Mr. Krull's good time credits constitutes a violation of the Fifth Amendment is now moot because he has been released from prison.  *Krull v. Oey*, 805 F. App'x 73, 74 (2d Cir. 2020).  However, the Second Circuit remanded for further proceedings on the merits of Mr. Krull's Fifth Amendment challenge to the Program to the extent it resulted in an increased risk level under the Sex Offender Registration Act.  *Id.* at 75.  This Second Amended Complaint therefore focuses on the adverse, lifelong consequences Mr. Krull continues to endure since his release from Clinton.

[3] The sentencing court is typically the same criminal court where an inmate was convicted.  N.Y. Correct. Law § 168-l.

- Factors 1-7 consider the severity of an individual's current offense, with points ranging from 0 to 175;

- Factors 8-11 consider criminal history, with points ranging from 0 to 65;

- Factors 12-13 consider an individual's behavior while incarcerated, with points ranging from 0 to 35; and

- Factors 14-15 consider an individual's post-release environment (*e.g.*, living or employment situation), with points ranging from 0 to 25.

44.     The Board assesses and tallies points for each of the 15 factors and then recommends to the sentencing court an inmate's post-release risk level. RAI scores below 70 result in a risk level one; scores between 75 and 105 result in a risk level two; and scores larger than 105 are accorded a risk level three.

45.     In turn, risk levels determine monitoring, reporting, and registration requirements that individuals must comply with after they are released from incarceration.

46.     After receiving the Board's recommendation, the sentencing court can decide whether to adopt or depart from the Board's RAI assessment. However, the sentencing court may only reduce the number of points upon a showing of clear and convincing evidence. Accordingly, the Board's RAI tally and consequent risk level recommendation become an individual's presumptive risk level after release.

47.     Under factors 1-7, the Board (acting through Board member Kathleen Murtagh) assessed Mr. Krull 65 points (out of a potential total of 175) in

connection with the underlying offense of which he was convicted. The Board did not assess Mr. Krull any points under factors 8-11 for his criminal history (he had none). The Board also did not assess any points under factors 14-15 for Mr. Krull's post-release environment (Mr. Krull was slated to return to the same apartment he had lived in prior to incarceration and had already secured post-release employment).

48.    Thus, but for the Board's consideration of factors 12-13, Mr. Krull would have been a presumptive risk level one registrant. However, while assessing no points under factor 13 pertaining to Mr. Krull's conduct while incarcerated (which was exemplary), the Board assessed the maximum number of points (15) under Factor 12 for Mr. Krull's purported failure to "accept[] responsibility" for his crime of conviction because of his expulsion from the Program.

49.    Factor 12 leaves no room for discretion. If an individual is expelled from (or refuses to participate in) the Program for any reason (even for invoking his constitutional rights), he or she is automatically assessed 15 points by the Board. Conversely, if Mr. Krull had incriminated himself and been allowed to successfully complete the final portion of the Program, the Board would have imposed zero points under Factor 12 and recommended that he be classified as risk level one. In exchange, however, Mr. Krull would have faced potential perjury

charges and undermined his own appeal and his position in any retrial resulting from a reversal of his conviction.

50.     Thus, but for the Board's assessment under Factor 12 for Mr. Krull's invocation of his Fifth Amendment rights, Mr. Krull would have received fewer than 70 points on the RAI scale and would have been classified as risk level one.

51.     Thereafter, at a risk level hearing on or about January 6, 2020, the Bronx County Criminal Court designated Mr. Krull as risk level two.

52.     Additionally, around this time period, Mr. Krull's application for a Certificate of Relief from Disability was denied.  If issued, a Certificate of Relief from Disability can remove bars for formerly incarcerated individuals in applying for jobs, licenses, public housing, and other aspects of post-incarceration life. Upon information and belief, Mr. Krull's application for a Certificate of Relief from Disability was denied because he was expelled from the Program.

Mr. Krull Continues to Suffer Consequences After Release

53.     Mr. Krull was released from prison on or about January 26, 2020.  He moved back to Yonkers, New York and began caring for his father, who was in poor health at the time and has since passed away.

54.     Because of his designation as risk level two, Mr. Krull is included in New York State's online directory of registered sex offenders (which is limited to level two and level three sex offenders).  As a result, Mr. Krull's photograph, exact

address, and vehicle registration information, along with details of his conviction, are available to the public free of charge via a simple search through the online directory. Because he is classified as risk level two, he must also register as a sex offender for life. If Mr. Krull were classified as risk level one, he would not be included in the online sex offender directory and he would only be required to register as a sex offender for 20 years.

55.    Social science research shows that when community members learn that a sex offender lives in their neighborhood, they may become fearful and may harass, victimize, or discriminate against registered offenders. Indeed, Mr. Krull is already feeling those consequences and has already suffered as a result of his risk level two status.

56.    Because his face and personal information (including home address and vehicle registration information) are publicly displayed, Mr. Krull lives in constant fear of being recognized or identified and subjected to intimidation or violence.

57.    In fact, multiple neighbors and acquaintances who were once friendly toward Mr. Krull, even after his return from prison, have abruptly stopped acknowledging his existence. In part due to the increased exposure of being classified as a risk level two, Mr. Krull has been diagnosed with PTSD, depression, and anxiety.

58.    Not only is Mr. Krull unable to reap certain post-incarceration benefits as a result of having been denied a Certificate of Relief from Disability, but the denial of the Certificate—which was a consequence of Mr. Krull's expulsion from the Program—also prohibits Mr. Krull from serving as an executor of his father's estate (in accordance with his father's will).

59.    In sum, Mr. Krull's expulsion from the Program for exercising his constitutional rights resulted in severe and lasting personal, reputational, and professional harm.

## CAUSE OF ACTION

60.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

61.    Acting under color of state law, Defendants Annucci and Harrington and employees acting under their supervision violated Vladimir Krull's Fifth Amendment right against self-incrimination, the Fourteenth Amendment, and 42 U.S.C. § 1983.

62.    As a result, Mr. Krull is entitled to declaratory and injunctive relief as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Krull respectfully requests that the Court enter judgment in his favor and against Defendants:

A.    Declaring that Defendants' actions violated Mr. Krull's Fifth Amendment right against self-incrimination;

B.    Declaring that DOCCS' policy and practice of requiring inmates to admit guilt for their underlying conviction or be expelled from, or barred from participating in, the Program violates the Fifth Amendment;

C.    Declaring that the Board's policy and practice of increasing the RAI score and resulting risk level for inmates who are expelled from, or decline to participate in, the Program based on the exercise of their constitutional right against self-incrimination violates the Fifth Amendment;

D.    Enjoining, directing, and ordering the Board to conduct a reevaluation of Mr. Krull's RAI without increasing his score under Factor 12 or otherwise penalizing him based on his invocation of his Fifth Amendment right against self-incrimination or the fact that he was expelled from the Program;

E.    Awarding reasonable attorney's fees to Plaintiff; and

F.    Ordering such other relief as the Court deems just and proper.

Dated:  New York, New York
       May 28, 2021

SCHULTE ROTH & ZABEL LLP

By:

/s/ Gary Stein
_____
Gary Stein
Mark L. Garibyan
Michael Periatt
919 Third Avenue
New York, NY 10022
Telephone: 212.756.2093
Gary.Stein@srz.com
Mark.Garibyan@srz.com
Michael.Periatt@srz.com

By:

/s/ Daniel R. Lambright
_____
Daniel R. Lambright
Christopher T. Dunn
125 Broad Street, 19th Floor
New York, N.Y. 10004
(212) 607-3300
dlambright@nyclu.org
cdunn@nyclu.org

*Attorneys for Plaintiff Vladimir Krull*