UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

VLADIMIR KRULL,

               Plaintiff,

   -against-

ANTHONY ANNUCCI, in his official
Capacity as Acting Commissioner of the
New York State Department of Corrections
and Community Supervision, and
MICHELE HARRINGTON, in her official
Capacity as Chairperson of the New York
State Board of Examiners of Sex Offenders,

               Defendants.
-------------------------------------------------------X

21-CV-03395(CM)(JLC)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/5/2022

## DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff Vladimir Krull's Second Amended Complaint ("SAC") pleads a single claim

against Defendants Anthony Annucci, the Acting-Commission of the New York State Department

of Corrections and Community Supervision ("DOCCS") and Michele Harrington, Chairperson of

the New York State Board of Examiners of Sex Offenders (the "Board"). Krull alleges that the

defendants violated his Fifth Amendment right against self-incrimination. Specifically, Krull

contends that the DOCCS Sex Offender Counseling and Treatment Program ("SOCTP" or the

"Program") violated his Fifth Amendment right against self-incrimination because the SOCTP

required him to either admit guilt or face an increased risk level assessment under the New York

Sex Offender Registration Act ("SORA"). Because he refused to admit guilt as part of the SOCTP,

Krull alleges that he was expelled from the Program and assessed 15 extra points on his Risk

Assessment Instrument ("RAI") score for his refusal to "accept responsibility" for his acts.

Because of the additional 15 points, Krull alleges that he was classified as a Level Two, rather than a Level One, risk offender, which materially impacts his post-release requirements.

Krull's First Amended Complaint in this case, filed *pro se* in the Northern District of New York, was dismissed. Specifically, as to Krull's Fifth Amendment claim, the court held that (i) Krull's claim that statements made by him during the course of the Program might be used against him in some future proceeding was speculative and remote; (ii) the loss of good time credits did not amount to compelled self-incrimination; and (iii) whether choosing between the assignment of additional SORA points and self-incrimination violated Krull's Fifth Amendment rights was not yet ripe, as no SORA hearing had yet taken place and Krull had not then been assigned a SORA risk-level score.

Krull appealed. In May 2020, the Second Circuit, in *Krull v. Oey*, 805 F. App'x 73 (2d Cir. 2020), held that Krull's self-incrimination claim based on an his being assigned a higher risk level was ripe for adjudication because, subsequent to the district court's decision, the SORA hearing had taken place and Krull had been assigned a SORA risk-level score. The Second Circuit stated that the District Court had dismissed the complaint on ripeness grounds and so had not determined "the merits question" of whether "an increased SORA risk level" assessment constituted an adverse consequence sufficiently severe to compel self-incrimination in violation of the Fifth Amendment's Self-Incrimination Clause. *Id.* at 75. It remanded the complaint for determination of whether Krull had stated a Section 1983 Fifth Amendment claim based on the assignment of additional SORA points.

The Second Circuit noted that, under *McKune v. Lile*, 536 U.S. 24 (2002), "A sex-offender treatment program that requires disclosure of criminal conduct without guaranteeing immunity does not violate the Fifth Amendment's Self-Incrimination Clause unless the consequences for

2

non-disclosure compel the prisoner to make self-incriminating statements," but said that, "We have not yet applied *McKune* to a self-incrimination claim" where the adverse consequence is an increased SORA risk level assessment. *Id.* It left that question open for the District Court to consider on remand.

After remand, the parties consented to transfer this case to the Southern District of New York and on May 28, 2021, Krull – now represented by counsel – filed the SAC.

Defendants move to dismiss the SAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), on four separate grounds: (1) the complaint fails to state a claim, (2) Krull lacks standing to sue the Defendants because these particular individuals did not "cause" him to be designated a Level Two offender, (3) the lawsuit is, in reality, a challenge to the state court's decision to designate him a Level Two offender and so is barred under the *Rooker-Feldman* doctrine; and (4) Krull's claims for declaratory relief are moot. (Dkt. No. 70).

For the following reasons, Defendants' motion is DENIED.

## BACKGROUND

A. *The SORA Framework*

SORA (N.Y. Correct. Law. § 168, *et seq.*) requires that inmates who have been convicted of certain sex offenses be certified as a sex offender and assessed for risk of re-offense prior to being released from prison. (SAC ¶ 15; Dkt. No. 71 ("Br."), at 7).

Under SORA, a five-member Board reviews the file of sex offenders, including the risk level of that offender, and recommends to the sentencing court that the offender be assigned a particular offender "Level" prior to his/her release. (SAC ¶ 42; Br. 7). A "Level One" classification indicates a low probability that the offender will reoffend; Level Three indicates a high risk of reoffending. (SAC ¶ 44; Br. 7). Level Two, obviously, is the intermediate classification.

Level Two and Level Three offenders have their "personal identifying information including . . . names, photographs, home addresses, and employer addresses" listed in a public state database online; a Level One does not. (Br. 7; *see* SAC ¶ 54). A Level Two or Three offender must register as a sex offender for life, while a Level One need only register for twenty years. (SAC ¶ 54).

Per the complaint, the Board's recommendation to the sentencing court is guided "largely" by the offender's RAI score. (Br. 8; SAC ¶ 44); *see* N.Y. Correct. L. § 168, *et seq*. The RAI score is calculated by tallying points assessed in fifteen different categories, including the severity of the offense and the offender's criminal history, conduct while incarcerated, and post-release plans. (SAC ¶ 43). Factor 12 of the RAI score relates to the individual's behavior while incarcerated, specifically whether an offender participated in treatment and accepted responsibility for his actions, refused treatment or was expelled from treatment. Up to 15 points can be added to the offender's RAI if s/he refuses to participate in a treatment program. (*Id.* ¶ 31).

The sentencing court then conducts a hearing to determine the inmate's risk level. *See* N.Y. Correct. L. § 168-d. The court must "allow the sex offender to appear and be heard." *Id.* § 168-d(3). Prior to the hearing, the state provides the court with a written statement setting forth the recommended risk level and reasons for that recommendation. *Id.* The state bears the burden of proving the facts supporting the recommendation by clear and convincing evidence. *Id.* The court may depart from the Board's recommendations. (Br. 10 (citing cases)).

B. *The Criminal Case Against Krull*

Plaintiff Vladimir Krull – a former Sergeant in the New York City Police Department – was arrested in February 2015 on six counts of sexual abuse of a 13-year-old girl. (SAC ¶¶ 25-26). Krull pled "not guilty." (*Id.* ¶ 30). His case proceeded to trial in January 2017 in the Bronx County

Criminal Court, where Krull took the stand and testified that he was innocent of the charges against him. (*Id.* ¶ 27). On January 30, 2017, the jury found him guilty on three of the six counts – specifically, he was convicted of second-degree rape and second-degree criminal sexual acts – and Krull was sentenced to three years in prison. (*Id.*); *Krull*, 805 F. App'x at 73 n.1.

After his trial, Krull appealed his conviction and moved before the trial court to vacate the conviction for ineffective assistance of counsel pursuant to N.Y. Criminal Procedure Law § 440. (SAC ¶ 28). His motion to vacate his conviction was denied and the Appellate Division, First Department denied his request for leave to appeal the denial. (Dkt. No. 82 ("Opp.") at 6 n. 2). At the time the motion to dismiss was filed in August 2021, Krull's appeal of his conviction was still pending before the First Department. (SAC ¶ 28). Indeed, as of the writing of this decision, it appears from the First Department's public docket that the appeal still has not yet been decided. *See People v. Krull*, No. 2017-02646 (1st Dep't).

*C.   The Sex Offender Counseling and Treatment Program at Clinton Correctional Facility*

On or about April 6, 2017, Krull commenced serving his sentence at Clinton Correctional Facility ("Clinton"). (SAC ¶¶ 27, 29). Krull met with the Offender Rehabilitation Coordinator ("ORC") assigned to him, Ms. Banker, regarding his participation in the SOCTP. (*Id.* ¶ 29). Krull told Ms. Banker that he did not want to participate in SOCTP because he did not want to admit guilt for his crime of conviction – a perfectly understandable position for him to take, since his case was still on appeal. (*Id.* ¶ 30). Ms. Banker assured him that he would not have to admit guilt to participate in SOCTP, but that if he did not participate, he would face consequences, including (i) an assessment of 15 points on Factor 12 of his RAI score, (ii) placement on "keeplock" status (confinement to a cell for 23 hours a day for up to 30 days), (iii) loss of good time credits; and (iv) a disciplinary note on his record. (*Id.* ¶ 31).

Defendants admit the consequences of refusing to participate in, or being expelled from, the SOCTP, including the 15-point assessment on Factor 12 of an offender's RAI score. (Br. at 6). However, as Ms. Banker assured Krull at the time, the DOCCS policy states that an inmate participating in SOCTP need not "admit the commission of a particular crime." *Krull v. Oey*, No. 9:19 Civ. 0142 (TJM/CFH), 2019 WL 1207963, at *3 (N.D.N.Y. Mar. 14, 2019). Instead, "the inmate must openly and honestly discuss the behavior that resulted in his or her incarceration and/or referral to the program, demonstrate acceptance of responsibility for the conduct that resulted in his or her criminal conviction, and demonstrate an understanding of his or her sexual offending behavior and cycle of abuse." *Id.*[1]

Krull alleges that the DOCCS policy's purported assurance that participants "need not admit 'the commission of a particular crime'" is entirely "illusory" because admitting "responsibility for the 'conduct' or 'behavior' that resulted in [the] conviction and incarceration . . . necessarily [means] admitting the commission of a particular crime, namely, the crime [he was] convicted of." (SAC ¶ 22). Krull alleges that accepting guilt for the crime of conviction would subject him to potential perjury charges since he testified as to his innocence at trial and would compromise the direct appeal of his conviction, including his position in a potential retrial if his conviction were reversed. (*Id.* ¶ 49).

Nevertheless, Krull agreed to participate in the SOCTP. (*Id.* ¶¶ 33, 34). He also alleges that he was a star student for the first five months of the six-month long Program. (*Id.* ¶¶ 36-37). He completed all assignments and received "excellent (near-perfect) written evaluations." (*Id.* ¶ 37).

---

[1] The Court may take judicial notice of statutes, regulations, policy statements, guidelines and similar official documents governing an administrative agency or published pursuant to its delegated authority. *See Frith v. Hill*, No. 07 Civ. 5899 (JSR), 2009 WL 3073716, *16 n. 10 (S.D.N.Y. Sep. 23, 2009).

His in-person evaluations also resulted in positive feedback including that "he was doing well and making progress in the program." (*Id.* ¶ 38).

However, with one month left in Program, Krull was called in for a meeting with three ORCs who allegedly demanded he "accept responsibility for [his] crimes" or be expelled. (*Id.* ¶¶39-41). Krull refused to accept responsibility and was expelled from the Program. (*Id.* ¶ 41).

*D. The Plaintiff's SORA Risk Assessment and SORA Hearing*

On October 25, 2019, the Board assessed Krull's RAI score. Adding all factors except Factor 12 resulted in a total score of 65, which would mean a recommended classification as a Level One risk offender. (SAC ¶¶ 42, 47). However, on Factor 12, the Board assessed 15 points for refusal to "accept[] responsibility" based on "his expulsion from the Program." (*Id.* ¶ 48). Had he completed the Program by accepting responsibility, Krull alleges he would have been assessed zero points for Factor 12. (*Id.* ¶ 49).

Krull alleges that but for his alleged refusal to self-incriminate, his score would have been 15 points lower and he would have been classified as a Level One offender; instead, he was classified as a Level Two offender. (*Id.* ¶¶ 49-50). Krull maintains that he was faced with "a Hobson's choice: either incriminate [himself] while incarcerated and thereby risk prosecution for perjury and undermine any chance of overturning [his] conviction, or refuse to self-incriminate and face onerous penalties following . . . release from incarceration attendant to those with higher risk levels." (*Id.* ¶¶ 5, 6).

I emphasize, Krull was doubly at risk of self-incrimination at the time he was participating in the SOCTP. First, his appeal was still pending, so his conviction was not yet final (and is apparently not yet final today); admitting to the conduct that underlay his conviction would have rendered his appeal nugatory and deprived him of that right. Second, unlike many inmates who

have longer sentences or who did not testify at their trials, Krull – who testified in his own defense – was asked to admit to the underlying conduct while it was still possible to prosecute him for giving perjurious testimony at his trial; perjury has a five-year statute of limitations, *see* NY Penal Law §§ 210.15, 210.20, Crim. Proc. § 30.10(2)(b), and Krull testified in January 2017.

After receiving the Board's recommendation and the parties' positions on the determinations to be made, the sentencing court, Justice Harold Adler presiding, conducted a hearing and finally adjudicated the question of Krull's risk level on January 6, 2020. (*Id.* ¶ 51; Br. 15; Dkt. No. 72-2). Justice Adler determined that Krull should be designated a Level Two offender. (SAC ¶ 51).[2]

In the SORA hearing, Assistant District Attorney ("ADA") Astrid Borgstedt explains to the court that the Board had assessed Krull 15 points on Factor 12 "for not accepting responsibility and refus[ing] or [being] expelled from treatment." (Dkt. No. 72-2 ("Tr."), at 5:10-13). Specifically, she explains that Krull "was removed from the sex offender treatment program in June of 2018" and argued that Krull "wrote two separate letters, one to the board . . . [and] a letter to your Honor where he's failed to accept or he continues not to accept responsibility and he maintains that he's not guilty of these crimes . . ." (*Id.* at 5:15-6:3). She went on to explain that he

---

[2] Defendants submit the transcript from the hearing to the Court and ask the court to take judicial notice. For the purpose of this decision, I consider the transcript both for the fact that Justice Adler determined Krull to be a Level Two offender and for the contents of the transcript itself because (1) the transcript is integral to the SAC, and (2) the transcript is a public record of which the court can take notice without converting the motion to dismiss to one for summary judgment. *See Dixon v. von Blanckensee*, 994 F.3d 95, 102-103 (2d Cir. 2021) (considering state court hearing transcript on appeal of motion to dismiss both for the fact that the hearing occurred, who appeared, and the substance); *see also Thomas v. Westchester County Health Care Corp.*, 232 F.Supp.2d 273, 275-276 (S.D.N.Y. 2002) (citing cases); *Tyson v. City of New York (Administrative Child Services)*, No. 18-cv-8515 (GBD) (KHP), 2019 WL 8437455, at *1 (S.D.N.Y. Nov. 8, 2019), *R.R. adopted* 2020 WL 949484 (Feb. 27, 2020) (citing cases). In considering a motion to dismiss, the court "may consider any . . . documents upon which the complaint relies and which are integral to the complaint" to determine whether the allegations are plausible. *Subaru Distributors Corp. v. Subaru of America, Inc.*, 425 F.3d 119, 122 (2d Cir. 2005). The transcript is integral to the SAC because Krull repeatedly refers to his designation as a Level Two offender by the sentencing court in the SAC (*see* SAC ¶¶ 9, 51, 54, 55, 57); Krull knew of and possessed (or at least could access) the transcript; and Krull does not dispute the transcript's authenticity. (*See e.g.*, Opp. 13-14); *Thomas*, 232 F.Supp.2d at 275-276.

was expelled from the Program for failure "to abide by the program goals, which is that he demonstrates an acceptance of responsibility for sexually offending behavior, develop and demonstrate an understanding of the cycle of sexual offense behavior and develop a plan for intervention and prevention strategy, and at that point is where [Krull] failed to participate and failed to fulfill the guidelines of that program." (*Id.* at 6:15-24).

Justice Adler ultimately rejected the Board's decision to recommend a full 15-point penalty for Krull's failure to accept responsibility. He instead assessed Krull 10 points on Factor 12, citing two Second Department cases: *People v. Palladino*, 46 A.D.3d 864 (2d Dep't 2007) and *People v. Fortin*, 29 A.D.3d 765 (2d Dep't 2006), *leave denied* 7 N.Y.3d 712 (2006). In *Palladino*, the Appellate Division held, "the Court properly assessed the defendant 15 points for his failure to accept responsibility for the offenses and for his refusal to complete the sex offender treatment program," as, "A defendant may properly be assessed points under SORA for refusing to accept responsibility for his actions" and that the imposition of points did not violate the defendant's Fifth Amendment right against self-incrimination because, having already been convicted, "he faces no such substantial or real hazard of self-incrimination." *Palladino*, 46 A.D.3d at 865-66. Similarly, in *Fortin*, the Appellate Division upheld the Court's "assess[ment of] an additional 10 points for [the defendant's] failure to accept responsibility" because "the Risk Assessment Guidelines require that an offender have a 'genuine acceptance of responsibility' for his or her actions." *Fortin*, 29 A.D.3d at 766.

Justice Adler proceeded to explain that, in this case, "obviously, beyond a reasonable doubt the defendant committed these acts . . . [A]s a person who heard the case and is aware that this defendant has been convicted . . . of sexual acts with a person under the age of 16 . . . the Court feels that it is appropriate to assess the [ten] points in 12." (*Id.* at 10:11-11:25). In assessing 10

points on Factor 12, Justice Adler was troubled by Krull's ongoing lack of acceptance of responsibility for the sexual offenses for which he had been convicted, which, under SORA, was sufficient reason to add ten points to his risk score.

### E. Procedural History

On February 5, 2019, Krull – while still incarcerated at Clinton – filed a complaint *pro se* in the Northern District of New York against DOCCS and DOCCS officials challenging the SOCTP as violating his Fifth Amendment right against self-incrimination and his Fourteenth Amendment rights of due process and equal protection. (*See* Dkt. No. 1). On March 14, 2019, the District Court dismissed the complaint with leave to amend. *See Krull v. Oey*, No. 9:19 Civ. 0142 (TJM/CFH), 2019 WL 1207963, at \*3 (N.D.N.Y. Mar. 14, 2019).

On May 14, 2019, Krull filed an Amended Complaint again asserting Fifth and Fourteenth Amendment claims; Krull also moved for a temporary restraining order and preliminary injunction seeking to bar defendants from adding points under "Factor 12" to Krull's RAI score and seeking restoration of certain good time credits that he had lost. (Dkt. Nos. 12, 13). On June 25, 2019, the District Court denied the preliminary injunction motion and dismissed the Amended Complaint for failure to state a claim. (Dkt. No. 25); *see Krull v. Oey*, No. 9:19-CV-0142 (TJM/CFH), 2019 WL 2590739 (N.D.N.Y. Jun. 25, 2019). Specifically, on the Fifth Amendment claim, the court held that (i) Krull's claim that statements made by him during the course of the Program might be used against him as part of a future proceeding was purely speculative and remote; (ii) the loss of good time credits did not amount to compelled self-incrimination; and (iii) the assignment of additional SORA points was not yet ripe, as no SORA hearing had yet taken place and Krull had not then been assigned a SORA risk-level score. *Id.* at \*9-10.

Krull appealed. *See Krull*, 805 F. App'x at 73-74. In May 2020, the Second Circuit noted that Krull had had his SORA hearing and had been assigned a SORA risk Level Two score after the district court's decision, thereby making his "self-incrimination challenge (*i.e.*, Level Two) . . . a live case or controversy." *Id.* at 75. It remanded for adjudication of whether Krull had stated a self-incrimination claim based on assessment of an increased risk level. *Id.* In remanding, the Second Circuit explained that, under *McKune v. Lile*, 536 U.S. 24 (2002), "A sex-offender treatment program that requires disclosure of criminal conduct without guaranteeing immunity does not violate the Fifth Amendment's Self-Incrimination Clause unless the consequences for non-disclosure *compel* the prisoner to make self-incriminating statements." *Krull*, 805 F. App'x at 75. (emphasis added) But the Court noted that, "We have not yet applied *McKune* to a self-incrimination claim" where the plaintiff challenges a sex offender treatment program on the ground that the prospect of "an increased SORA risk level" compels self-incrimination. *Id.*

After remand, the case was transferred to the Southern District of New York. On May 28, 2021, Krull filed the SAC. Defendants moved to dismiss on August 6, 2021.

## STANDARD

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'" *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM), 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 555).

## DISCUSSION

Although the Second Circuit remanded the case so a district court could evaluate on the merits the Defendants' contention that Krull failed to state a cause of action, the motion to dismiss the SAC raises two other issues. I will discuss them first.

## I. KRULL'S CLAIM IS NOT BARRED UNDER THE *ROOKER-FELDMAN* DOCTRINE.

Defendants argue that the *Rooker-Feldman* doctrine bars plaintiff's lawsuit because "in reality he is seeking to challenge the state court's decision to designate him a risk Level Two offender." (Br. 21).

The *Rooker-Feldman* doctrine dictates that federal courts lack subject matter jurisdiction over cases that are essentially "appeals from state-court judgments." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005). The Supreme Court has "confined" application of this doctrine only to "'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Id.* at 85 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).

A four-part test must be satisfied for the doctrine to apply: (i) the plaintiff must have lost in the state court action; (ii) the plaintiff must allege injuries caused by the state court judgment; (iii) the plaintiff must invite district court review and rejection of that judgment; and (iv) the judgment of the state court must have been issued prior to the commencement of the federal court proceeding. *Id.*

Assessing these factors, the doctrine does not apply in this case. On the first factor, it is true that Krull was assessed a SORA risk Level Two after a SORA hearing, over the arguments of his counsel that he be assessed no points, which could be considered the "loss" in that action. (*See*

Tr., at 7:12-14:11). On the second factor, it is also true Krull alleges that it is being designated a Level Two offender by the court that causes him harm. (*See* SAC ¶¶ 54-58).

However, on the third factor, Krull's Fifth Amendment challenge to the SOCTP does not invite a review and rejection of the state court's judgment but seeks instead a declaration that the DOCCS' policy and practice of requiring an admission of guilt (or "acceptance of responsibility"), to complete the SOCTP, while increasing the RAI score and risk level for inmates who "fail to complete" SOCTP for that reason, violates the Fifth Amendment.

Defendants claim that this is just "clever pleading," which the Court should overlook. But analysis of the fourth factor demonstrates that this is not just a case of clever pleading to avoid the *Rooker-Feldman* doctrine: The state court's order assigning Krull his risk assessment score issued after Plaintiff filed this lawsuit. Plaintiff commenced his lawsuit challenging the SOCTP as violating his Fifth Amendment right against self-incrimination while still incarcerated, on February 5, 2019, prior to any state court judgment on his SORA risk level. He has maintained that claim through multiple complaints and an appeal to the Second Circuit. The Second Circuit remanded the case for adjudication on whether he has stated a claim under *McKune* on the basis that his increased risk level assessment amounted to a sufficient adverse consequence to constitute compelled self-incrimination in violation of the Fifth Amendment. The Second Circuit is obviously aware of the *Rooker-Feldman* doctrine; I very much doubt that it would have remanded for adjudication on that question if there were any question that it applied to this particular case.

I thus reject the argument that the *Rooker-Feldman* doctrine bars Plaintiff's claim.

## II.   THE INJURY ALLEGED IS FAIRLY TRACEABLE TO DEFENDANTS

Defendants next argue that Krull "lacks standing because he cannot establish that the alleged injury he suffered . . . is 'traceable' to" the Defendants. (Br. 20). The standing argument is

that the alleged injuries are not "traceable" to the Defendants because Justice Adler designated

him a Level Two offender, not the Defendants. (*Id.*). They claim that any injury Krull suffers from

today is "solely" traceable to the court and "the purported unconstitutional policies of the

defendants played no role in plaintiff's designation as a risk Level Two offender." (*Id.*).

This is not really a standing argument; it is, rather, an argument that Krull has sued the

wrong people – people who did no wrong.

Plaintiff argues in opposition that the injuries are fairly traceable to the Defendants'

conduct because, "Defendant Annucci oversees DOCCS, which is responsible for Krull's

expulsion from SOCTP for invoking the Fifth Amendment" and "Defendant Harrington oversees

the Board, which is responsible for the subsequent automatic assessment of points under Factor

12." (Opp. 17). Krull argues that the Defendants' "actions harmed Krull because they led to his

. . . designation of a risk level two. Krull's harm is thus traceable directly to the policies and

procedures overseen by the Defendants and agents acting under their authority." (*Id.*).

Again, I agree with Plaintiff. This is simply a variant of Defendants' *Rooker-Feldman*

argument; they argue that Krull's injury is traceable, not to the recommendation by the Board, or

to his assigned RAI score, but to Justice Adler's final determination of his risk level. But Krull is

challenging a DOCCS policy that resulted in the recommendation to the court. It may well turn

out, as the facts are developed, that courts never or only rarely vary from the risk level

recommended by the Board, or that they never vary lower, only higher. If that be the case, then the

real injury to the inmate is worked at the DOCCS level, since a Board recommendation that an

inmate be assessed at Level 2 (based on his RAI score) ends up being ultimately determinative that

he will be at least a Level 2 offender. Krull, as a person who was subject to DOCCS regulations

about the Program, is personally aggrieved by the results of the Program and so has "standing" to

sue if that Program violates his constitutional rights. The Defendants are ultimately responsible for the policy that required Krull either to incriminate himself or face the allegedly adverse consequence that he pleads.

## III.   KRULL HAS STATED A CLAIM FOR VIOLATION OF HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION.

The issue that the Court is tasked by the Second Circuit with deciding is whether the allegedly adverse consequence identified by Krull – being assigned a higher risk score by the Board for failing to admit to the conduct underlying his conviction – is sufficiently "adverse" to have compelled him to give up his Fifth Amendment right against self-incrimination.

The Fifth Amendment, applied to the states through the Fourteenth Amendment, states that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. "The 'Amendment speaks of compulsion,' . . . and the Supreme Court has insisted that the 'constitutional guarantee is only that the witness not be compelled to give self-incriminating testimony.'" *McKune*, 536 U.S. at 35-36 (quoting *United States v. Monia*, 317 U.S. 424, 427 (1943) and *United States v. Washington*, 431 U.S. 181, 188 (1977)).

The Supreme Court's plurality decision in *McKune*, written by Justice Kennedy, held that a sex offender treatment program that requires disclosure of criminal conduct without guaranteeing immunity did not necessarily violate the Fifth Amendment's Self-Incrimination Clause, but would do so if the consequence for non-disclosure were so serious that it effectively compelled the prisoner to make self-incriminating statements. *See Krull*, 805 F. App'x at 75. No five-judge majority accepted any single rationale for reaching this result. The guidance provided to lower courts by the *McKune* plurality is best summarized by the *McKune* Court's explanation that, "Determining what constitutes unconstitutional compulsion involves a question of judgment: Courts must decide whether the consequences of an inmate's choice to remain silent are closer to

the physical torture against which the Constitution clearly protects or the *de minimis* harms against which it does not." *McKune*, 536 U.S. at 41. Justice O'Connor, concurring in the result, explained, "The Court today is divided on the question of what standard to apply when evaluating compulsion for the purposes of the Fifth Amendment privilege against self-incrimination in a prison setting." *Id.* at 48. She criticized the plurality for "fail[ing] to set forth a comprehensive theory of the Fifth Amendment privilege." *Id.* at 54.[3]

Thus, *McKune* provides some guidance – but not "comprehensive" guidance – to lower courts as to what constitutes compelled self-incrimination in the context of a challenge to a sex offender treatment programs in prison, as here. We are the courts tasked with making the judgment call about whether a consequence is sufficiently serious to compel an inmate who is participating in a sex offender program to give up his constitutional rights in order to avoid that consequence.

What is clear after *McKune* is that an inmate may be placed in a position where he may suffer what any rational person would deem an adverse consequence for invoking his Fifth Amendment right against self-incrimination, as Krull did here, as long as that consequence does not fall too far to one side on a continuum of consequences ranging from "inconsequential" to "torture." The consequences to Krull in this case – a lifetime on the public sex offender registry, with consequence loss of privacy and unending collateral consequences – are far from inconsequential; neither do they rise to the level of physical torture. The question is whether they are close enough to the latter – or, perhaps more accurately, far enough from the former – to render Krull's choice no choice at all, but instead compulsion in violation of his Fifth Amendment rights.

---

[3] The dissent, written by Justice Stevens and joined by the Justices Souter, Ginsberg, and Breyer, called the plurality's decision a "unprecedented departure from the rule of law" in a "watershed case" that results in "evisceration of a constitutional right" – the Fifth Amendment right against self-incrimination – by holding that "a person who has made a valid assertion of the privilege may nevertheless be ordered to incriminate himself and sanctioned for disobeying such an order." *Id.* at 54. I make no secret of the fact that I concur 100% with the dissenters.

In *McKune*, the sex offender treatment program required the inmate to disclose past criminal conduct beyond the crimes of conviction but did not guarantee him immunity for those disclosures. Thus, if the inmate were to successfully participate in the sex offender treatment program, the inmate had to confess crimes for which he had not yet been convicted. Assuming the statute of limitations had not yet run (as is the case with Krull's situation vis-a-vis perjury), he could have been prosecuted for those crimes. If the inmate refused to participate, the consequences included a loss of prison privileges, such as visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, and a personal television. *McKune*, 536 U.S. at 31. In addition, the inmate "would be transferred to a maximum-security unit, where his movement would be more limited, he would be moved from a two-person to a four-person cell, and he would be in a potentially more dangerous environment." *Id.* In other words, his conditions of confinement would be altered for the worse – considerably so.

In holding that the sex offender treatment program's requirement of accepting responsibility did not violate McKune's Fifth Amendment rights, the Supreme Court noted, "It is well settled that the government need not make the exercise of the Fifth Amendment privilege cost free." *Id.* at 41. It explained that potentially being subject to prosecution for new crimes other than the crime of conviction (including specifically perjury) was not a sufficiently adverse consequence to compel the inmate to admit to other crimes – with "compel" seeming to mean "give him no real choice." *Id.* at 40-41.[4] The Court noted that it was not compulsion to be "asked to discuss other past crimes as part of a legitimate rehabilitative program conducted within prison walls," because "no inmate has ever been charged or prosecuted for any offense based on information disclosed

---

[4] It is not clear to this court, from reading *McKune*, exactly how the Supreme Court was able to reach the conclusion that no one ever had been prosecuted for any offense based on information disclosed during treatment; but assuming that the record contained evidence to this effect, it is not at all apparent how the Court could have concluded that no one ever would be so prosecuted in the future.

during treatment." *Id.* at 34, 40-41. The court also found that the state has a "paramount objective" and "undeniable interest" in "the rehabilitation of those committed to its custody," and "There is no indication that the [program] is an elaborate attempt to avoid the protections offered by the privilege against compelled self-incrimination." *Id.* at 37, 47.[5]

In addition to holding that the possibility of being charged with new crimes was not sufficient to constitute compulsion, the *McKune* court pointed out that, under other Supreme Court precedents, none of the following is deemed sufficiently adverse to render confession as part of a rehabilitative program "compelled" in violation of the Fifth Amendment: (1) facing additional incarceration time; (2) being transferred to a higher-security unit; (3) losing good time credits; (4) hurting one's chances of parole; (5) losing prison privileges; and (6) damaging one's own case for clemency on death row. *Id.* at 38-45 (discussing *McGautha v. California*, 402 U.S. 183 (1971), *Baxter v. Palmigiano*, 425 U.S. 308 (1976), *Bordenkircher v. Hayes*, 434 U.S. 357 (1978), *Minnesota v. Murphy*, 465 U.S. 420 (1984), and *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998)). In cases addressing each of these circumstances, the Supreme Court "determined that [the defendant's] hard choice between silence and the consequences was not compelled." *Id.* at 45.

However, Justice O'Connor in her concurrence pointed out that "certain types of penalties are so great as to 'compe[l]' [incriminating] testimony" including: "the potential loss of one's livelihood" (through, *e.g.*, "termination of employment" or "the loss of a professional license")

---

[5] The dissent disagreed, stating, "It is undisputed that respondent's statements on the admission of responsibility and sexual history forms could incriminate him in a future prosecution for perjury or any other offense to which he is forced to confess. It is also clear that he invoked his Fifth Amendment right by refusing to participate in the [the program] on the ground that he would be required to incriminate himself. Once he asserted that right, the State could have offered respondent immunity from the use of his statements in a subsequent prosecution. Instead, the Kansas Department of Corrections (Department) ordered respondent either to incriminate himself or to lose his medium-security status. In my opinion that order, coupled with the threatened revocation of respondent's Level III privileges, unquestionably violated his Fifth Amendment rights." *Id.* at 55-56.

and "the loss of the right to participate in political associations and to hold public office." *Id.* at

49, 50 (citing *Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation of City of New

York*, 392 U.S. 280 (1968), *Spevack v. Klein*, 385 U.S. 511 (1967), and *Lefkowitz v. Cunningham*,

431 U.S. 801 (1977)). However, she agreed that in the case before her, loss of certain prison

privileges and transfer to higher security housing unit were "minor" and thus concurred in the

Court's judgment. *Id.* at 51.

Courts in this Circuit have since applied *McKune* in their assessment of where particular

consequences for not admitting guilt as part of a sex offender treatment program fall on the

"inconsequential" to "torture" continuum.

A fulsome discussion of (and disagreement with) *McKune* comes from Judge Hurd in the

Northern District of New York in *Donhauser v. Goord*, 314 F.Supp.2d 119 (N.D.N.Y. Apr. 15,

2004). In *Donhauser*, Judge Hurd held that requiring inmate, as part of sexual offender counseling

program, to divulge his history of sexual misconduct violates the inmate's Fifth Amendment

privilege against self-incrimination because it forces him to admit guilt for illegal acts for which

no criminal charges have been brought or lose good time credits. In so holding, Judge Hurd took

issue with much of *McKune* and stated that "The plurality opinion in *McKune* fails to set forth the

controlling legal standard by which to adjudge prisoners' Fifth Amendment compulsion challenges

to a sexual offender treatment program." *Id.* at 126. Because the *McKune* court was "fragmented"

as to its rationale, Judge Hurd determined that "'the holding of the Court may be viewed as that

position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Id.*

(quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)). As such, Judge Hurd considered

Justice O'Connor's concurrence, joining only in the judgment because she agreed that a loss of

prison privileges and transfer to another facility did not compel self-incrimination in violation of

the Fifth Amendment. *Id.* Evaluating only those considerations, Judge Hurd held that the penalty

that the inmate faced – loss of good time credits or prosecution for other crimes – was sufficiently

severe to compel him to self-incriminate. Judge Hurd noted that a loss of good time credit affected

the length of his incarceration time, which was a "serious and potent" consequence. *Id.* at 132.

Since Judge Hurd's 2004 decision, many other district courts, and ultimately the Second

Circuit, have disagreed and held the opposite. *See Edwards v. Goord*, 362 Fed.Appx. 195, 198 (2d

Cir. 2010). In *Edwards v. Goord*, the Second Circuit in the habeas context upheld a state court's

determination that the petitioner's Fifth Amendment right against self-incrimination was not

violated when the Department of Corrections conditioned good time credits and discretionary

privileges on participation in sex offender treatment program. *Id.* Even though the program

required participants to admit responsibility for their crimes of conviction and for uncharged sex

offenses (with no offer of immunity), the Circuit found that under *McKune*, the state court's

determination was "not contrary to clearly established Federal law as determined by the Supreme

Court" in *McKune*. *Id.* at 199. District Courts have since recognized that "It is by now fairly well

settled that risking the loss of good time credits or jeopardizing the chance for parole, alone, does

not qualify as sufficiently compulsive to meet the test." *McChesney v. Hogan*, Nos. 9:08-cv-1186,

6:08-cv-1290, 2010 WL 1027443, at *7 (N.D.N.Y. Feb. 26, 2010), *R.&R. adopted* 2010 WL

1037957 (Mar 18, 2010); *accord Adams v. Annucci*, 2018 WL 4608216, at *8 (S.D.N.Y. Sept. 25,

2018) (dismissing Fifth Amendment claim for failure to state a claim; "because, as alleged,

Plaintiff was faced only with the choice between forgoing the potential for an earlier Conditional

Release date through accumulation of Good Time Credits . . . or admitting responsibility only for

his crime of conviction, his Fifth Amendment rights were not violated").

However, certain courts after *McKune* have continued to recognize that certain penalties can be sufficient to compel testimony, particularly where the punishment outlasts the prison term. For example, in *McChesney v. Hogan*, the court noted that a civilly committed sex offender *could* "establish the requisite degree of compulsion necessary to support a Fifth Amendment claim" where the sex offender treatment program required that he complete an autobiography disclosing uncharged sex crimes and undergo a polygraph and the "potential sanction for plaintiff's refusal to incriminate" was the possibility of "an extension of his confinement" in a psychiatric center. 2010 WL 1027443, at *7. Plaintiff could so establish because "plaintiff is a civil detainee whose liberty is being withheld beyond the expiration of his prison sentence. [Plaintiff] is therefore in a very different circumstance than the inmates involved in . . . *McKune*." *Id.*[6]

The Second Circuit has never applied *McKune* in a Fifth Amendment challenge to a sex offender treatment program, where the consequence of refusing to accept responsibility is a significant increase in the inmate's RAI score. *Krull*, 805 F. App'x at 75. It has directed that the lower court (which is now this Court) consider that question in the first instance. I conclude, on the facts of this case, that Krull states a plausible claim of compulsion, because (1) the evidence, once developed, may establish that the Board's RAI score and recommendation of a particular offender is the real determinative moment for an inmate's classification; and (2) the draconian difference between being classified as a Level One versus a Level Two sex offender renders the consequence of receiving a higher RAI score and recommended level so great as to effectively compel the inmate to incriminate himself during the DOCCS assessment process.

[6] While the court in *McChesney* agreed there was compulsion, the court ultimately found that the plaintiff failed to plead that the challenged sex offender treatment program violated his Fifth Amendment right because the plaintiff did not allege that he ever wrote an autobiography disclosing uncharged sex crimes that could be used against him in a criminal prosecution and a polygraph was inadmissible in any event. *Id.* at *6 (citing *Chavez v. Martinez*, 538 U.S. 760, 770 (2003), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).

Turning to the second of these factors first: in this case, the Court finds that Krull has pleaded at least a plausible claim that the threats to him constituted compulsion to self-incriminate in violation of his Fifth Amendment right. The consequences deemed *de minimis* by five members of the *McKune* court all related to the inmate's conditions of confinement, which, while far from as insignificant as the *McKune* majority seemed to believe, are at least temporary. But the consequence of being deemed a Level Two registered sex offender is a *de facto* lifetime sentence for an inmate's crime of conviction. As a Level Two offender, Krull must register as a sex offender for life, and his "personal identifying information including . . . names, photographs, home addresses, and employer addresses" is forever listed in a public state database online of offenders. (SAC ¶ 54). In short, for the rest of his life, Krull is subject to being a social pariah, with any personal privacy forever lost.

Had he been classified at Level One, he would need only register for twenty years, and his personal identifying information would not be listed in a publicly available registry. (*Id.*). Given the lack of public exposure of a Level One sex offender's history and whereabouts, it is no doubt far easier for a Level One offender to resume life in the community after paying his debt to society, to obtain employment, and to attain a level of social acceptance in the community than it is for a Level Two offender, who might well find any of that impossible of attainment. And for a Level One offender, the socially anonymous registration requirement eventually ends; for the Level Two offender, the loss of privacy and any resulting social consequences are unending.

In the opinion of this Court, the difference between those two classifications is far from inconsequential; and the unending nature of a Level Two offender's rupture from society falls far closer to torture that to some temporary "inconvenience" or "hardship" while incarcerated.[7] It is

---

[7] I cannot pretend not to know what I have learned over the past years – and especially during the past two years – about the conditions of incarceration in correctional institutions, both state and federal; I thus cannot agree with the

certainly more consequential than the loss of employment or a license to practice certain professions, which Justice O'Connor would have found sufficiently serious as to render confession as part of a sex offender program "compelled."

Of course, Defendants are correct that it is ultimately the sentencing court's final assignment of a risk level, rather than the assignment of RAI points by the Board, that causes the defendant to be "sentenced" to these life-long consequences. The statute ostensibly gives the sentencing court discretion to set aside the Board's recommendation, or to modify it (as occurred in this case, albeit without any benefit to Krull, since the Board recommended Level Two and he was classified as Level Two).

However, that takes us to the first of the two factors identified on page 21 of this opinion. If, as the complaint suggests, the results of the prison recommendation are as a practical matter determinative of an inmate's ultimate sex offender classification, then the fact that the plaintiff would have had to give up his Fifth Amendment rights (and, in this case, his right of direct appeal) in order to avoid the near-certainty of a life-long and public sex offender classification is sufficiently serious to constitute compulsion. But that presents a question of fact, one that must abide discovery.

Krull states a claim for violation of the Self-Incrimination Clause of the Fifth Amendment.

## IV.   KRULL'S CLAIMS FOR DECLARATORY RELIEF ARE NOT MOOT.

Defendants' final argument is that, because (1) Krull was released from DOCCS custody, his claims for declaratory relief are moot and (2) Krull does not have "standing" to challenge the Program, his claims for declaratory relief are moot. (Br. at 24). This is a frivolous argument in light of the fact that, as Plaintiff points out (Opp. at 21), the Second Circuit recently held that this

---

*McKune* majority that the deprivations in that case and in similar cases are as trivial that those Justices seem to think. I nonetheless must and do accept that a higher court than mine has ruled otherwise.

case presents a live case and controversy and is ripe for adjudication – and so held after Krull had been released from DOCCS custody. *Krull*, 805 F. App'x at 75. Krull's claim for a declaration that the Defendants violated his Fifth Amendment right against self-incrimination is not moot. And as noted above, Krull does have standing to attack the Program to which he was subject.

## CONCLUSION

For the reasons discussed above, the Defendants' Motion to Dismiss the Second Amended Complaint is DENIED. The discovery deadline is set at June 30, 2022.

This constitutes the decision and order of the Court. It is a written opinion. The Clerk of Court is respectfully directed to terminate the motion at docket number 70.

Dated: January 5, 2022

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

24